## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CASE NO. 2:24-cr-00048** |
| **Plaintiff,** | **JUDGE SARGUS** |
| **vs.** | **GOVERNMENT'S CORRECTED** |
| **RONALD P. BEDRA,** | **SENTENCING MEMORANDUM** |
| **Defendant.** | |

Defendant Ronald P. Bedra has pleaded guilty to conspiring to create and distribute animal crush videos, in violation of 18 U.S. Code § 371, and distributing animal crush videos, in violation of 18 U.S. Code § 48(a)(3). The videos, which depicted acts of extreme violence, sexual mutilation, and torture of monkeys, were commissioned by Bedra and his co-conspirators from individuals residing in poor countries in Southeast Asia. Based on the facts of this case, a sentence at the high end of the United States Sentencing Guidelines ("U.S.S.G.") range is appropriate.

## FACTUAL BACKGROUND

The offense conduct is summarized in paragraphs 8 through 23 of the Pre-Sentence Investigation Report (PSR) and the Statement of Facts attached to the Defendant's Plea Agreement. These documents are incorporated herein by reference. The government respectfully advises the Court and public readers that the details of the offense are disturbing, and that graphic statements and descriptions follow.

## PLEA AGREEMENT AND APPLICABLE SENTENCING GUIDELINES

On April 16, 2024, Ronald Bedra pleaded guilty to a two-count information charging him with conspiring to create and distribute animal crush videos and distributing animal crush videos.

1

As part of the plea agreement, the parties agreed to the following partial calculation under the Sentencing Guidelines:

- U.S.S.G. § 2G3.1                10 (base offense level for "obscenity")
- U.S.S.G. § 2G3.1(b)(1)(B)       +5 (distribution for valuable consideration)
- U.S.S.G. § 2G3.1(b)(3)          +2 (use of a computer or interactive computer
                                     service)
- U.S.S.G. § 2G3.1(b)(4)          +4 (portrayal of sadistic or masochistic conduct)

The parties did not reach an agreement as to any enhancement under U.S.S.G. § 3B1.1 applicable to Bedra. For the reasons set forth in its response to the initial PSR, and the reasons below, the government is requesting a 4-level enhancement based on Bedra's role as an organizer and leader of the conduct in question.

The government does not oppose a 2-level reduction in offense level pursuant to U.S.S.G. § 3E1.1(a) based upon the Defendant's acceptance of responsibility and an additional 1-level decrease pursuant to U.S.S.G. § 3E1.1(b) in recognition of the Defendant's timely notification of his intention to plead guilty, provided that the Defendant continues to demonstrate compliance with the terms of § 3E1.1.

*Bedra's Role as a Leader and Organizer*

Defendant Ronald Bedra should receive a 4-level enhancement for acting as a leader and organizer of the conduct at issue. The government will not re-hash each of the arguments in its objections to the PSR; however, it bears emphasizing how many of the relevant factors under the guidelines apply to Bedra. According to U.S.S.G. § 3B1.1 Note 4, the Court should examine "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." Although not all factors need to be found in order for the enhancement to be applicable, *see United States v.*

*Warren,* 2023 WL 1961222 at *3 (6th Cir. Feb. 13, 2023) ("Because these factors offer only useful guideposts, a court need not find them all met to apply the enhancement."), an examination of these factors shows that nearly all apply to Bedra, underscoring that he should receive a 4-level enhancement:

*Exercise of decision-making authority*: Bedra acted as a gatekeeper over those who sought admission to the groups he administered, controlling who got in and who didn't. He also chose which platforms to move to when one of his groups would get shut down. Bedra also posted rules for members of the group to follow regarding the sharing of videos both within and without the groups he administered, controlling the behavior of admitted members.

*Nature of participation*: As set out in the government's objections to the PSR, Bedra acted as leader of the groups he administered, he described himself in terms associated with a leadership role, and others repeatedly described him in this way as well.

*Recruitment of accomplices*: Bedra advertised Million Tears to prospective members in the comment section of YouTube videos. He also organized members when his groups were closed down by the platform, encouraging members who might consider abandoning the group that "we don't die so easy" and choosing names such as "Million Tears Ark" and "last of the last stands" for later groups.

*Degree of participation in planning and organization/degree of control and authority*: Bedra exercised control by virtue of his acting as a gatekeeper into the groups, by acting as administrator of the groups, by establishing rules for how and when videos could be shared, by setting up new groups whenever earlier groups were shut down, and by organizing the "monkey adoption program" for members to participate in.[1]

---

[1] The monkey adoption program was advertised by Bedra, who also published his "finalized rules" for the program. Bedra described a system whereby members had 48 hours to purchase the rights to an advertised

Based on these facts, as well as those set out in the government's objections to the PSR, Bedra should receive a 4-level enhancement for acting as a leader and organizer. The government thus calculates the Defendant's offense level as follows:

- U.S.S.G. § 2G3.1                 10 (base offense level)
- U.S.S.G. § 2G3.1(b)(1)(B)        +5 (distribution for valuable consideration)
- U.S.S.G. § 2G3.1(b)(3)           +2 (use of a computer or interactive computer
                                      service)
- U.S.S.G. § 2G3.1(b)(4)           +4 (portrayal of sadistic or masochistic conduct)
- U.S.S.G. § 3B1.1                 +4 (organizer or leader)
- U.S.S.G. § 3E1.1                 -3 (acceptance of responsibility)

**Total Offense Level          22**

## SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

The Court should sentence Bedra at the high end of the guidelines. Such a sentence is necessary in light of the considerations under 18 U.S.C. § 3553(a). In particular, the nature and circumstances of the offense, the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, the need for the sentence imposed to afford adequate deterrence to criminal conduct, the need for the sentence imposed to protect the public from further crimes of the defendant, and the need for the sentence imposed to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

### The Violent Acts Perpetuated by the Defendant

In fashioning an appropriate sentence, this Court should acknowledge the extraordinary level of pain and suffering that Ronald Bedra inflicted for his own personal pleasure. Although the plea agreement and PSR describe some of the Defendant's conduct, the government cannot

---

monkey. After "adoption," Bedra wrote that "adoptive parents…may begin making video requests via PM to Demon Sword Soulcrusher [i.e. Bedra]." Afterward, "[y]ou then own that monkey and get five requests included in the adoption fee."

overstate the level of depravity Bedra exhibited, nor the pain and suffering endured by the monkeys he had tortured. Bedra's own words are perhaps the best descriptor of the level of violence he wished to see perpetrated for his own enjoyment. Below are a small sample of the messages Bedra sent to his co-conspirators and others:

**Bedra: During that entire wax video, ALL I wanted to see was them jamming the flaming candle end into its dick and twisting it.**

**Bedra: Cut out its balls, cover them in something delicious, watch it eat its own balls.**

**Bedra: [M]aybe a roadflare up its ass?**

**Bedra: Put [a severed penis] in his mouth and light it like a cigarette.**

**Bedra: It was nice and battered after he kicked it a few times. Some more goodness could have happened before it got cooked into the fetal position.**

**Bedra: I'd like to see teeth pulled**

**Bedra: He can snip off the entire tail and shove it down its throat.**

**Bedra: Oh it wasn't 100% dead until just before the last video**
**Or right after the vomit.**
**I think the muscles were so cooked at the surface that it couldn't move**
**…**
**And it hurt so bad it vomited. Then it probably choked to death.**
**Co-Conspirator 1 (CC1):   If only he'd KEEP FILMING**
**Bedra: I know. The breaks between parts are awful.**

> **Especially those past two.**
> **He barely got the vomit on camera**
> **See if he can start the video with the diaper on the monkey.**

It is unclear why the Defendant, or anyone, would take pleasure in acts of such depraved violence. Nonetheless, it is clear that Bedra derived genuine excitement and joy from the pain and suffering of his victims. He went so far as to use a still image from a video wherein a living monkey had had the skin peeled off of its face as his avatar, such that every time he logged into the groups in question or posted a comment, the image of the monkey's skinless face would appear. He also used the following language to describe actual or anticipated videos: "very excited," "great stuff," and "whoa, a feast for my eyes!"  In another instance, Bedra stated, "[m]assive stress relief for me. They might seriously be why I haven't attacked any hoodrat students this year."[2] These statements make clear that Bedra was not a reluctant participant, but an enthusiastic proponent who spent untold hours reveling in the agony of defenseless baby monkeys.

_The Victims of the Offense_

The immediate victims of the Defendant's conduct were the monkeys that were tortured at the request of the Defendant and his co-conspirators. The monkeys observed by investigators, including the screwdriver video, appear to be long-tailed macaques. Below are two photographs of long-tailed macaques for reference:

---

[2] At the time, Bedra was working as a public-school teacher.

 

*Photographs courtesy of University of Wisconsin National Primate Research Center*

This species is native to Southeast Asia, including Indonesia.[3] The average lifespan of a long-tailed macaque is 31 years, and they feed on fruit, roots, crabs, and insects. They sleep in trees, often huddled in large groups for warmth. Depending on their habitat, these creatures spend their days foraging in mangrove swamps, collecting fruit, swimming in rivers, and swinging through trees.[4]

The individual monkeys that the Defendant subjected to prolonged torture were generally baby or juvenile macaques. They were sometimes dressed up in children's clothing or diapers prior to being tortured. The Defendant and his co-conspirators often expressed a preference for monkeys that had been coddled prior to being tortured. For instance, in one exchange CC3 and Bedra discussed the possibility of purchasing a baby monkey to torture. CC3 sent the following image of the monkey, which was advertised for sale, to Bedra:

---

[3] *Long-tailed macaque fact sheet*, UNIVERSITY OF WISCONSIN NATIONAL PRIMATE RESEARCH CENTER (last accessed Sep. 25, 2024), *available at* https://primate.wisc.edu/primate-info-net/pin-factsheets/pin-factsheet-long-tailed-macaque/#evolution-ecology
[4] *Id.*



Afterward Bedra and CC3 exchanged the following messages:

**CC3: He's apparently a real super clinger. Screeches if he's not touching a human**

**Bedra: That sounds ppppppeeeeeerrrrrfect**

The vulnerability inherent in the monkeys Bedra ordered to be tortured is a fundamental aspect of the nature and circumstances of Bedra's offense. This helplessness is on full display in each of the videos Bedra had commissioned. The images below are disturbing, but they are necessary to understand the defenselessness of these victims, and thus the true nature of the Defendant's conduct:



*Still image from the "Finger Lickin' Good" video, taken prior to the monkey's fingers being cut off and placed in its mouth:*



*Still image from the "Monkey Forest Adventure – Prince Albert" video, taken prior to the monkey having a pin pushed through its ears, brow, nose, and penis.*



*Still image from the "screwdriver" video, after the monkey has had a red-hot screwdriver inserted into its anal cavity.*

The "screwdriver" video from which the image above was taken, was the culmination of months of effort on the part of Bedra and his co-conspirators. Below is a sample of some of the Defendant's messages in which he expressed his enthusiasm for such a video:

**Bedra: The Burning hot screwdriver up the butt is my request**

**Bedra: Add the word "deep"**

**Bedra; Burning hot screwdriver deep into asshole. Spin monkey on it.**

**Bedra: YES PLEASE**

**Bedra: Get screwdriver RED HOT. Put it up ass. Hold screwdriver still and spin monkey on it.**

**Bedra:** [5]



After receiving the screwdriver video, Bedra sent the following message,

**Bedra: BURNING HOT SCREWDRIVER SUPERGLUED INTO A BUTTHOLE**

Bedra and his co-conspirators also joked about what they had done, with Bedra even

proposing ordering a "custom flask" to commemorate the occasion.

In another instance, the following image was circulated by a co-conspirator with the

question "Who wants to see this fucker offed?"



---

[5] Note that Bedra sent the image of a hot piece of metal with the caption "Example pic for [VO]" with the the pejorative "tard" in place of the first syllable of the videographer's last name.

11

This image was followed by this exchange between a co-conspirator and Bedra (AKA Ron DemonSword Soul Crusher) discussing what acts of torture to request:



The monkey depicted above was tortured, and after the resultant video was circulated, Bedra sent the following critique,

> **Bedra: Wow. So the Fire Dick video? 65/100. Kind of awesome. Needed another shot, though. I mean, why stop?**
> **Bedra: Circumcision? Interesting. Monkey seems to have gone into predator shutdown early. Pussified Youtube monkey.**
> **Bedra: The rest? Man, just abysmal. Demand a refund. Unless he plans to try again. I don't see a corpse, unless he already sent it up the river or lost it in his mom's vagina**
> **…**
> **Bedra: I think it was tied on the tree like that to make the dick stick out. Like, I thought that video was just aces for the first third of a dickburn video.**

The Defendant's celebration of these videos, when contrasted with the sheer brutality attendant to them, is difficult to fathom. This conduct is harmful to the monkeys, to the videographers, and to society. At a minimum, this behavior warrants a sentence at the high end of the guideline range.

_The Human Impacts of the Offense_

When fashioning a sentence, this Court should also consider the psychological harm undoubtedly suffered by those conscripted into creating the videos by the Defendant and his co-conspirators. As demonstrated by the messages below, the co-conspirators knew that these individuals (known as "videographers" or "VOs"), who were generally Indonesian, were poor and were capable of being manipulated into performing acts of grotesque violence for incredibly small sums of money.

In one, CC1 introduces himself to a potential videographer (VO1),

13

**CC1: [VO1], in this group we all hate monkeys. Especially the young ones who just make noise and feed ALL DAY LONG. We are the ones who would like to pay you for monkeys, and then videos of those monkeys being treated badly in many different ways. Would you like to make some money, sir?**

**CC1: If you do a good job with video and torturing monkey we will make a lot of video requests and you will make good money…[b]ut we are not going to pay unless the video content meets our requests. If you do what we say we will pay very well. $$$**

Thereafter, CC1 introduces VO1 to the larger group of co-conspirators, including Bedra:

**CC1: say hello, everyone! [VO1], this is the group who can change your life for the better** 😊

After this introduction, the co-conspirators sent the following messages to VO1:

**CC3: $10 for 5 minute video request is fair. $5 up front and $5 paid when you complete video request.**
**Bedra: Many people would do multiple videos a week at $10 each, I bet.**

Bedra and CC2 separately discussed their negotiating strategy with a potential videographer:

**CC2: I'm getting him below $20. I'll tell him our other vo will do it for less. He needs us more than we need him. I sent him a message. Waiting on a response.**
**Bedra: Yeah I could be a more…regular customer if it were ten. He would get lots of requests from our group at that rate. I'll start ANOTHER chat for that.**
**Bedra: 15 if negotiations stall, but it wouldn't get as much.**
**Bedra: $20…his shit would have to be super great.**

14

In another conversation, CC2 and Bedra discussed another potential videographer,

> **CC2: I got one [video] for free. The one of him swinging it around was $2.**
> **Bedra: Hey, not bad. Will he throw it hard at the wall?**

The co-conspirators even acknowledged that the videographers did not want to perform the requested acts. In one instance, CC1 sent the following message to Bedra's group "the last of the last stands" regarding a videographer he was angry with for not performing torture in the way requested,

> **CC1: I think he honestly doesn't want to hurt them or see them hurt.**
> **GAAAYYEEEEEEE**
> **Bedra: I think you are right, [CC1].**

Another common discussion topic among the co-conspirators was their displeasure with the videographers and their belief that the videographers were ignorant and were being paid too much money. The following are examples of these conversations:

> **CC2: I'm chatting with stupid [VO1] now**
> **CC2: I did threaten [VO1's] life if he sells or gives away anything we order but hes such a damn idiot who knows if hes intelligent enough to listen.**

In another exchange, Bedra described his method for explaining his video preferences to the videographers:

> **Bedra: Tie monkey arms and legs to tree/cage/whatever. Tie very tight. [VO1] use stick to hit monkey. Hit monkey very hard on head.**
> **Bedra: You have to talk so that if you read it out loud you sound like a caveman or Hulk.**
> **Bedra: Had to do that with D-tard. It helped a lot.**

In several chats, the co-conspirators expressed an understanding that the videographers were so poor, that they needed the money from the videos to buy food.

> **CC1: [I]s there anyone willing or able to 'handle' [VO1] for me quick?...this fuckstick shows me two monkeys he's bought, NOW totaling $170 because one was 70 and one was $100, and then he asks me to send money for milk or fruit and the difference in cost**

In another chat, CC3 sent the following message to the group:

> **CC3: As much as you think you need him for videos he NEEDS that money**

In still another, after expressing their disappointment with the first iteration of the "screwdriver" request (because the hot screwdriver was touched to the outside of the anus, but not inserted into the anus), CC2 and Bedra discussed getting their revenge on the VO:

> **CC2: I have posted all over YouTube for nobody to send him money**
> **CC2: I already sent him a message today and told him I hope he's hungry because we just sent our VO $200**

In another, CC3 expressed his hatred for a VO after a video was not to his liking:

> **CC3: I am angry at [VO1] for being a shit and how much money you sent him. It is seriously fucked up. Please be sure to tell him he fucked up his chance for more money.**
> **…**
> **CC3: I hate [VO1] like hes a monkey**
> **CC3: Nasty sniveling lying thieving greedy lazy gross fucker**
> **CC3: Monyet[6] [VO1]**

---

[6] Note: "monyet" is the Indonesian word for "monkey."

Finally, in another instance, Bedra sent a mocking image of an orangutang labeled with the name of VO1, an image of a cell phone, and crude drawings of bracelets similar to those worn by the videographer in several of the videos at issue here. Bedra described this depiction as his "masterpiece."



*Image sent by Bedra mocking an Indonesia individual hired top perform acts of torture*

<u>*Sentences in Other Animal Crush Offenses and Similar Offenses*</u>

To date, there have not been many cases sentenced involving conduct similar to that committed by the Defendant. Of the defendants convicted and sentenced for commissioning violent monkey crush videos, the sentences have been 51 months, *United States v. Devilbiss*,

3:23-cr-153, (MDFL, June 18, 2024); 48 months, *United States v. Noble*, 6:23-cr-181 (D. Ore. April 24, 2024); and 366 days, *United States v. Herrera,* 3:23-cr-76 (W.D. Wisc. Dec. 20, 2023). Each of these individuals was charged based on a single video. Another individual, Brent Justice, was sentenced to 57 months' incarceration for producing and distributing videos of puppies, chickens, and kittens being tortured, *United States v. Justice*, 4:12-cr-731 (S.D. Tex. Aug. 18, 2016), although Justice had already been sentenced to 50 years' imprisonment at the state level.[7]

Although not directly analogous, the sentences received by individuals convicted of dogfighting are nonetheless instructive. Dogfighting, which is governed by U.S.S.G. § 2E3.1, inherently involves violence against animals. However, rarely is there suffering on the level seen here. Indeed, the Application Note to § 2E3.1 expressly acknowledges this and allows that "an upward departure may be warranted if (A) the offense involved extraordinary cruelty to an animal beyond the violence inherent in such a venture (such as by killing an animal in a way that prolongs the suffering of the animal.)" Defendants convicted of dogfighting have been sentenced to 54 months, *see United States v. Love*, 3:17-cr-51 (D.N.J. Jul. 8, 2019); 42 months*, see United States v. Gaines*, 3:17-cr-309 (D.N.J. Mar. 5, 2018); 48 months, *see United States v. Arellano*, 3:17-cr-51 (D.N.J. Apr. 10, 2019); 60 months, *see United States v. Chadwick*, 7:16-cr-122, 2017 WL 6055384, *2-3 (E.D.N.C. Dec. 1, 2017); 45 months, *see United States v. Cook*, 7:16-cr-122, 2017 WL 6055385, *2 (E.D.N.C. Dec. 1, 2017); and 60 months, *see United States v. Richardson*, 7:16-cr-122, 2017 WL 6055773, *2-3 (E.D.N.C. Dec. 1, 2017). Of note, most of these dogfighting cases involved far fewer dogs than the number of monkeys that Defendant Bedra and his co-conspirators had tortured.

---

[7] Justice was later re-sentenced to 20 years' incarceration in Texas state court after an appellate court ruled that a deadly weapon enhancement could not be applied to animal cruelty cases. His revised sentencing range was 2 to 20 years.

As these sentences make clear, a sentence at the high end of the Guideline range is the minimum amount necessary to avoid unwarranted sentence disparities.

*Individual and General Deterrence*

Finally, a sentence at the high end of the Guidelines is necessary in light of the need to deter others and to protect the public from the Defendant. Bedra himself organized and led groups with sometimes dozens of members, and the co-conspirators discussed other groups that contained over 100 members. Given this, a significant sentence is necessary to deter individuals from engaging in similar conduct going forward.

Deterrence of Ronald Bedra himself is likewise necessary. Bedra only stopped engaging in this conduct when a search warrant was executed on his residence. He did not stop on his own. Since then, and despite being on strict conditions of pretrial release, Bedra has used AI image generators to create pictures of, inter alia, "Chase of Paw Patrol in a shredder," "Big Bird's aching cloaca," "Elmo staring at Big Bird's cloaca," and "Oscar throwing garbage bags full of children into the lake." These materials share distinct similarities to the videos at issue and reinforce the need to deter Bedra individually.


**CONCLUSION**

Considering all of the 18 U.S.C. § 3553(a) factors and the guidelines applicable to obscenity offenses, the government requests that the Court sentence Ronald Bedra to the high end of the Sentencing Guidelines.

KENNETH L. PARKER
UNITED STATES ATTORNEY

TODD KIM
ASSISTANT ATTORNEY GENERAL
Environment and Natural Resources Division
U.S. Department of Justice

_____

ADAM C. CULLMAN (KY #93912)
Special Assistant United States Attorney &
Sr. Trial Attorney, Environmental Crimes Section
Environment and Natural Resources Division
221 E. 4th St. Ste. 400
Cincinnati, OH 45202
adam.cullman@usdoj.gov

*/s Mark Romley*

_____

MARK ROMLEY (CA #240655)
Trial Attorney
Environmental Crimes Section
Environment and Natural Resources Division
999 18th St., Suite 370
South Terrace
Denver, CO 80202
mark.romley@usdoj.gov

*/s Nicole Pakiz*

_____

NICOLE PAKIZ (0096242)
Assistant United States Attorney
303 Marconi Boulevard, Suite 200
Columbus, OH 43215
Phone: 614-469-5715
nicole.pakiz@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 30th day of September, 2024, a copy of the foregoing government's Corrected Sentencing Memorandum was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

<u>/s Adam C. Cullman</u>
Adam C. Cullman (KY #93912)
Special Assistant United States Attorney &
Senior Trial Attorney, Environmental Crimes
Section